## JORDAN v WHITING CORPORATION (ON REHEARING)

1. JUDGMENT—DIRECTED VERDICT—WRONGFUL DEATH—NEGLIGENCE—
   WARRANTY.

   A directed verdict in a wrongful death case for the death of a
   plaintiff's decedent caused by electrocution in favor of a defend-
   ant electrical subcontractor who. had done some electrical in-
   stallation work on a crane was proper where there were no
   allegations of any general or specific acts of negligence made,
   the subcontractor supplied materials and did the wiring but did
   not manufacture, sell, or design anything and could have done
   nothing to prevent the accident short of stationing a guard at a
   lockbox; there was no case against the subcontractor in negli-
   gence or in warranty.

2. TORTS—LIABILITY—MANUFACTURED COMPONENTS—POTENTIAL DAN-
   GERS—FORESEEABILITY.

   Tort liability stemming from the obligation that generates the
   duty to avoid injury to another which is reasonably foreseeable
   does not extend to the anticipation by a manufacturer of how
   the manufactured components not in and of themselves danger-
   ous or defective can become potentially dangerous dependent
   on their integration into a unit designed, assembled, installed,
   and sold by another.

3. PRODUCTS LIABILITY—WARRANTY—IMPLIED WARRANTY—NEGLI-
   GENCE.

   A manufacturer of units to be assembled by another into a crane
   and sold to a purchaser of the completed unit was not guilty of
   negligence or breach of implied warranty by failing to manu-
   facture a product which would never need repairs.

REFERENCES FOR POINTS IN HEADNOTES
[1] 53 Am Jur, Trial § 332.
   26 Am Jur 2d, Electricity, Gas, and Steam § 193.
[2] 63 Am Jur 2d, Products Liability § 180 *et seq.*
[3] 63 Am Jur 2d, Products Liability §§ 110–118.
[4] 63 Am Jur 2d, Products Liability § 130.
[5] 63 Am Jur 2d, Products Liability § 78 *et seq.*
[6] 30 Am Jur 2d, Evidence § 1082.
[7] 20 Am Jur 2d, Costs § 87 *et seq.*

4. PRODUCTS LIABILITY—WARRANTY—NEGLIGENCE—CAUSATION.

Reasonable performance can be demanded in warranty but even in warranty there must be evidence of causation and because a device had needed repairs previously the cause of the electrocution of a repairman who might possibly have been making additional repairs does not become jury submissible with only that quantum of proof and no more.

5. PRODUCTS LIABILITY—DUTY OF CARE—REPAIRMEN—QUESTION OF FACT.

The difference in the duty of care owed by a manufacturer to users and the general public and to repairmen engaged in making repairs is not inflexible, and in determining the line of demarcation whether there is or is not a duty to a repairman the Court of Appeals must revert to the legal principle that when the minds of reasonable men cannot differ the question is one of law for the court and will require a purely legal determination and where the facts adduced may fairly support differing conclusions the question must be submitted to the trier of fact.

6. EVIDENCE—CONFLICTING TESTIMONY—CLOSE CASE—JURY VERDICT.

Conflicting testimony concerning the grounding of an electrical installation in a wrongful death case for the electrocution of a crane repairman which resulted in a testimonial conflict made out a close case which called for jury instruction and a jury verdict rather than a verdict by order of the court.

7. COSTS—APPEAL AND ERROR—TAXATION—PREVAILING PARTY—APPORTIONMENT.

Costs on appeal are allowed to the prevailing party where the party has prevailed in full and are allowed proportionately where the party has prevailed only partially. (GCR 1963, 526, 822).

Appeal from Wayne, Nathan J. Kaufman, J. Submitted Division 1 August 28, 1972, at Detroit. (Docket No. 11580.) Decided September 25, 1973. Leave to appeal granted, 391 Mich —.

Complaint by Thelma L. Jordan, administratrix of the estate of John C. Jordan, deceased, against Whiting Corporation, Dearborn Fabricating & Engineering Company, and N & K Electric Company for negligence and breach of implied warranty of

fitness in causing the electrocution of decedent. Lumbermens Mutual Casualty Company intervened as party plaintiff. Judgment on directed verdict for defendants. Plaintiff appealed. Remanded for limited reconsideration · of decedent's due care for his own safety. The trial court reversed its prior holding and granted a new trial. Defendants appealed. Affirmed, 42 Mich App 448 (1972). On rehearing the original order of the trial judge granting a directed verdict as to the defendant Dearborn is vacated and the grant of a new trial as to defendant Dearborn is affirmed.

*Lopatin, Miller, Bindes & Freedman (Michael H. Feiler,* of counsel), for plaintiff.

*Plunkett, Cooney, Rutt & Peacock,* for defendant Whiting Corporation.

*Butzel, Long, Gust, Klein & Van Zile* (by *James D. Ritchie* and *Chester E. Kasiborski, Jr.),* for defendant Dearborn Fabricating & Engineering Company.

*Vandeveer, Doelle, Garzia, Tonkin & Kerr, P. C.,* for defendant N & K Electric Company.

Before: V. J. BRENNAN, P. J., and QUINN and O'HARA,* JJ.

O'HARA, J. The tortuous trail of this litigation began in 1967 in the case of *Jordan v C A Roberts Co,* 379 Mich 235; 150 NW2d 792 (1967). Since then it has been reported on rehearing in 381 Mich 91; 158 NW2d 901 (1968), and as *Jordan v Whiting Corp,* 42 Mich App 448; 202 NW2d 477

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

(1972), in the Court of Appeals. Presently it is before us on rehearing from our decision in the latter case.

The order granting the rehearing provides:

"It is further ordered that plaintiff shall file a brief with supporting record references to sustain her contention that the trial court erred in directing a verdict in favor of defendants. The brief and supporting record references shall be specific as to the duty defendants owed plaintiff's decedent, how it was breached, what implied warranty is relied on and how it was breached. Plaintiff shall have 30 days to file and serve her brief."

Thus it becomes our duty to discuss the relationship of each of the three defendants to plaintiff's decedent as to the claimed negligence and the breach of an implied warranty of fitness.

We start with the undisputed facts. C. A. Roberts Company, decedent's employer, wanted an overhead crane for its place of business. It ordered one from Dearborn Fabricating & Engineering Company. Dearborn in turn purchased certain component parts of the whole unit from Whiting Corporation, which manufactured them. The whole unit depended upon electrical power to function. Dearborn engaged N & K Electric Company as a subcontractor to do some of the electrical work to energize the unit.

Next, we recite facts that while not totally undisputed are on required favorable view to plaintiff to be taken as true for the purpose of testing the grant of a directed verdict in favor of all three defendants in the trial court.[1]

---

[1] Subsequently, the trial court reversed its position after a limited order of remand by this Court, and granted a new trial. In our original reported opinion, 42 Mich App 448; 202 NW2d 477 (1972), we affirmed the grant of a new trial. The basic issue abides, however, the propriety of the direction of a verdict in favor of all defendants.

Plaintiff's decedent was at work on the overhead crane. Under permissible inference on favorable view he was there to repair it. He was found dead lying across the unit. His death was caused by electrocution. There were no witnesses to his death. He was presumed to have been in the exercise of due care for his own safety. This presumption was raised to the level of substantive evidence by the majority opinion in *In re Wood Estate*, 374 Mich 278; 132 NW2d 35 (1965), and *Wirtanen v Prudential Ins Co*, 27 Mich App 260; 183 NW2d 456 (1970).

First, we analyze the relationship of N & K Electric as to negligence. The modern view which has been incorporated in general terms and in basic principle into our tort law is expressed by Professor Prosser as that duty is that obligation "recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks." Prosser, Torts (3d ed), § 30, p 146. This concept incorporates the historic element of reasonable foreseeability.[2] Under a written contract, which became an exhibit in the trial court, N & K undertook to install certain electrical controls, do some wiring and extend the feeders to the crane's power lines. It manufactured nothing. It sold nothing. It designed nothing. It simply supplied the materials and did the wiring so the unit could be electrically energized. Among the things it included was a lockbox by which the electric current to the crane could be shut off, leaving the unit inert. The switch was not in the "off" position when plaintiff's decedent was electrocuted. His wife was permitted to testify in substance that he

[2] For a useful discussion relative to "foreseeability" see *Elbert v Saginaw*, 363 Mich 463; 109 NW2d 879 (1961).

always shut off the power before making any repairs to the crane. There is no off-record explanation as to how it came to be "on". There is no allegation of any general or specific act of negligence on the part of N & K Electric. Bench questioning on rehearing as to what negligent act plaintiff relied upon to sustain its case in negligence against N & K elicited a generalized answer, with the candid statement by appellate counsel that he was not authorized to agree to dismissal of any party.

There simply is no case against N & K in negligence or in warranty. Short of stationing a guard at the lockbox, N & K could have done nothing to prevent decedent's electrocution. The trial judge was right when he initially directed a verdict in favor of N & K. We were in error when we affirmed his grant of a new trial as to it. We direct the reentry of the directed verdict in the trial court as to defendant N & K Electric.

We turn now to the case against Whiting Corporation. This defendant manufactured components which were ordered and bought from it by Dearborn. As to foreseeability and tort liability, Whiting could not have known—at least so far as the record shows—how these components were to be fashioned or fabricated into the completed unit. The obligation that generates the duty to avoid injury to another which is reasonably foreseeable does not—at least yet—extend to the anticipation of how manufactured components not in and of themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a unit designed, assembled, installed, and sold by another. We test the claimed liability against Whiting by the specific allegations of negligence and breach of implied

warranty. Three of them relate to alleged failure to (a) use reasonable care in relation to installation of the crane's electrical lockout box; (b) failure to provide adequate warnings on the electrical lockout box; and (c) failure to ground the electrical system of the crane. Manifestly, Whiting had nothing to do with any of the foregoing. The point is so clear as to warrant no discussion. The fourth allegation was:

"(d) Failure to design, sell, and install a crane with interlocking arms of sufficient strength to avoid a repairman having to climb atop the crane to straighten the arm."

The general nature of the allegation would certainly have been the proper subject of a motion to make the allegation more specific as to defendant Whiting. But then it is not part of the function of an appellate court to tell defendant how to try its lawsuit. Under our adversary system Whiting may well have chosen to say in effect "let plaintiff prove all of that; it has nothing to do with us". Whiting, according to the record, did not design and did not install a crane. Neither did it sell a crane to anybody. It sold certain units to be assembled into a crane which in turn was fabricated or assembled and sold by another to a purchaser of the completed unit. The only vestigial connection Whiting might have had was to manufacture interlocking arms which would never need repairs. We are cited no law and extensive independent research reveals none which imposes that duty in law.

The last of plaintiff's allegations against all defendants is:

"(e) Failure to install insulating covers on the crane trolley wires or buss [sic] bars."

Plaintiff does not specify whose burden it was to install the covers. Mayhaps she did not know. Mayhaps she conceived it the burden of the three named defendants to establish whose failure (assuming the "failure" was actionable) it was.

As previously noted it surely was no failure by or duty of N & K. Whiting in its reply brief concedes that it "also made a cover for the electrical buss *[sic]* bars and would have been glad to sell the plaintiff's (decedent's) employer a cover". The brief further recites that the "employer * * * did not want to buy a cover".

We can hardly be expected to hold, since the exposed bars did not violate any electrical code legislatively imposed (a fact conceded by plaintiff), that Whiting had the obligation, and more importantly the *right* to insist that the purchaser buy the covers.

The case against Whiting fails in negligence because whatever the claimed defects of manufacture or the interlocking arms Whiting could not possibly be held reasonably to foresee that a repairman would be involved in servicing that part of the total assembled units when the adjacent wires were "hot".

The case against Whiting fails in warranty because there is no testimony that decedent was at the place where he was electrocuted in order to repair the allegedly defective arms. True there was testimony by the one witness that problems had been experienced previously because an arm would bend and the crane would not lock in position. Another witness testified that *if,* and we emphasize the "if", the arm were designed too "soft" or too long it *might* bend (again the emphasis is ours) and become inoperative. Two witnesses agreed that the component could have been de-

signed so it would not bend. In the last analysis breach of warranty by Whiting would have to rest upon the premise that Whiting was obligated to manufacture a component that would not need repairs. We are cited no law, nor has our very extensive research disclosed that any such a duty exists under the theory of either negligence or warranty. This standing alone, of course, is not reason enough to deny recovery against Whiting. Any time a new duty is judicially promulgated some court has to say it for the first time. We do not believe it would be within the realm of reason to proclaim such a duty. Reasonable performance can be demanded in warranty. Perfection and the non-requirement of repairs seems to us to exact more of a manufacturer than human limitations can meet. However, this issue might become subject to review by the Supreme Court. That Court might take a contrary view. Therefore we hold additionally that even in warranty there must be evidence of causation. Because a device had needed repairs before the question of the cause of the electrocution of a repairman who might possibly have been making additional repairs does not become jury-submissible with only that quantum of proof and no more.

The trial judge was right initially when he directed a verdict in favor of defendant Whiting. We were in error when we affirmed the grant of a new trial. As in the case of N & K, we direct the reentry of the directed verdict in favor of defendant Whiting.

Finally, we examine the case against Dearborn Fabricating and Engineering Company. Under Dearborn's statement of facts the following is its position in the litigation:

"Dearborn Fabricating received an order for an over-

head crane from the C. A. Roberts Company, which order particularized the kind of crane Roberts desired and the respective parts that were to make up the crane. The order was sent by Dearborn Fabricating to defendant Whiting Corporation, which delivered the respective parts to defendant Dearborn Fabricating. Dearborn Fabricating then assembled the parts into a crane and installed it for C. A. Roberts."

The statement of facts also recites that "Dearborn * * * sold it to decedent's employer".

It is, of course, obvious that Dearborn is somewhat more involved in the case than either Whiting or N & K Electric. True the purchaser specified the parts to be used to make up the completed unit. However, Dearborn did assemble it, sell it and install it. We recognize that Dearborn's duty and liability, if any, are to be tested essentially by the same legal principles that control the duties and liability of N & K and Whiting except as the additional facts of the case may vary the relationship between plaintiff's decedent and this defendant.

Earlier herein we set out verbatim plaintiff's allegations of the conduct of the three defendants upon which she depended for sustaining her cause of action. We need not set them out with that specificity again. We will discuss them, however, as they relate to Dearborn.

The case against Dearborn fails in negligence as to all of the alleged duties save one because Dearborn too could not possibly have foreseen reasonably that an employee of the purchaser would be undertaking any service or repair of the unit while electricity was being fed to the unit when there was a lockbox which could cut off the power and which could be locked in the "off" position. Yet

manifestly it was not off or plaintiff's decedent could not possibly have been killed.

The case against Dearborn fails in warranty in all particulars save one because as we noted earlier even in warranty under the most strict liability there must be some evidence that will establish or support a reasonable inference of causation before a jury-submissible question is made out.[3]

The one exception we note is the failure to ground the electrical system.

Since N & K was limited to the items specified in a written contract, and this item was not included, N & K cannot be held for this omission, if it be actionable.

Since Whiting did not install the crane in the purchaser's building, it too is excluded from the force of this allegation.

Dearborn did install it. In this particular we cannot find of record a clear unequivocal direction by the purchaser not to ground the unit as was the case in the choice not to insulate (other than by isolation) the bus bars or trolley.[4]

This brings us to the thus far undiscussed question of the difference in degree of duty of a manufacturer, designer, seller or installer to one operating the device and one who in any other lawful way is exposed to and injured by a claimed malfunction or defect in design, selection of material, or assembly of components.

Obviously in law and in reason there must be a

---

[3] *See generally Piercefield v Remington Arms Co,* 375 Mich 85; 133 NW2d 129 (1965); *Heckel v American Coupling Corp,* 384 Mich 19; 179 NW2d 381 (1970); *Parsonson v Construction Equipment Co,* 386 Mich 61; 191 NW2d 465 (1971).

[4] We note with interest but without comment since we find no specific testimony on the point that N & K's "quote" provides: "Power wiring to insulate bar to be done by others".

difference. Defendant[5] cites *Shanks v Insurance Co of North America,* 211 So 2d 729 (La App, 1968), for the proposition that the duty of care a manufacturer owed to users and the general public does not exist as to a repairman engaged in making repairs when injured.

Plaintiff counters not with cited precedent, but with the provocative inquiry if it will become the law of this state that "repairmen are expendable" and no duty is owed. We think the rule of reason lies somewhere in between. We would be imprudent to undertake to fashion it inflexibly. We think that either in negligence or warranty this principle obtains and should be our controlling law. The repairman by the very nature of his undertaking exposes himself to hazards the injurious results of which might be actionable by a user or the general public but not actionable by him.

Where then lies the line of demarcation? We think we must revert to the long-standing legal principle (it has been called by many the "legal fiction") that when the minds of reasonable men cannot differ the question is one of law for the court and will require a purely legal determination. Where the facts adduced may fairly be said to support differing conclusions or inferences the question must be submitted to the trier of the facts be it jury or court sitting without a jury. It is not an exact rule, we know, but neither is law an exact science. The appellate adjudication does its best within its manifest and recognized limitations.

By this test then let us try to weigh the issue as between plaintiff and Dearborn as to the failure to ground the crane which plaintiff says gives rise to a question of fact in either negligence or warranty.

---

[5] Defendant Dearborn alone cites *Shanks, supra.*

Under the order for rehearing calling for spe-
cifics as to legal duties and supporting transcript
references Dearborn in compliance with the
Court's order says:

"As the last duty allegedly breached by defendants,
plaintiff points to a claimed failure to ground the
electrical system of the crane. It has been pointed out
that defendant Dearborn Fabricating did not perform
the electrical work. Furthermore, Mr. Joseph A. Daoust
testified that the crane was grounded (T. 674) and Mr.
Stephen Squillace testified repeatedly upon cross-exami-
nation that he didn't know if the crane's grounding
system had anything at all to do with decedent's elec-
trocution. (T. 408, 411, 439). Thus, the testimony of
plaintiff's own expert makes any inquiry into the
crane's grounding system irrelevant."

Plaintiff replies:

"[T]he question of defendants' failure to ground the
crane was likewise for the jury. Only the trier of fact
could determine whether, in light of Mr. Squillace's
testimony, defendants were negligent in failing to
ground the crane. In a similar case in *Mulcahy v Argo
Steel Construction Co,* 4 Mich App 116; [144 NW2d 614]
(1966), this Court stated in view of the testimony that
grounding might have prevented the injury that:
  " 'The question that must be answered in this regard
is not whether [defendant] or its employees were aware
or realized the benefits to be derived from the use of the
grounding devices on the power crane, but whether or
not a reasonably prudent person in the position of
[defendant], would have realized the benefits of ground-
ing devices and equipped the power crane with such
devices. *This is a question of fact for the jury to be
determined from the evidence.*' " 4 Mich App at 122;
144 NW2d at 617 (plaintiff's own emphasis).

Let us try to distill the voluminous record into
those facts and that testimony that either does or
does not create a jury submissible case on the one

narrow and last remaining issue raised by the complaint. We will set forth what we consider controlling numerically in an attempt to pinpoint the reasons for our holding.

1. Plaintiff's decedent was electrocuted at the place of his employment where he had a right to be in the performance of duties he had performed in the past.

2. There was a lockbox that had been installed which would shut off the electric current carried into certain components of the whole unit. If the current had been shut off the decedent could not have been killed.

3. No one knows with certainty why defendant was where he was at the time of his death. He was found dead. Under the majority opinion of *In re Wood Estate, supra,* he was presumed to have been in the exercise of due care for his own safety. The same majority holding raises that presumption to the status of substantive proof. No inference adverse to decedent can be taken from the fact that the power was not shut off.

4. Dearborn sold and installed the whole unit.

5. A witness, qualified as an expert and thus allowed under our system to give opinion evidence, testified that the crane was improperly grounded. He testified further and drew a diagram to explain why that had it been properly grounded decedent would have had a 70 to 80 percent chance of survival even though brought into contact with the "hot" wires or bars.

6. That same witness also testified under cross examination:

"*Q.* [T]hen you don't know whether the grounding had anything to do with his death or not, do you?

"*A.* That's right. I don't."

So there is the whole remainder of the lawsuit. Was it controlling and dispositive that the expert who testified to improper grounding, also testified he could not testify opinion-wise to any causal relationship between the alleged improper grounding and decedent's death?

We must say in candor that much of the testimony concerning "built-in" grounding, external grounding, lack of grounding and testimony of another of plaintiff's witnesses that the crane in fact was grounded makes out at best what must be called a close case. Yet there is no gainsaying that the testimony is there and our appraisal of its weight is not to the point. We would not be understood to mean than any testimony, however preposterous, however much discredited by cross examination which results in a testimonial conflict, is not susceptible of judicial disposition by the trial or appellate bench. Such is not the situation here as we view it. While the question is close—very close—as the Supreme Court very recently held:

"A very close question is presented, but * * * the doubtful case in each instance calls for jury instruction and jury verdict rather than a verdict by order of the court." *Washington v Jones,* 386 Mich 466, 471; 192 NW2d 234, 237 (1971).

We vacate the original order of the trial judge granting a directed verdict as to defendant Dearborn, and affirm our holding of a grant of a new trial as to defendant Dearborn in 42 Mich App 448; 202 NW2d 447 (1972), above cited.

Because our decision here is on rehearing granted and because our opinion here renders all issues other than plaintiff's allegation of failure to ground the unit res adjudicata in the trial court and this Court, we limit the proceeding in the trial court to the pleadings now of record in that court.

We respect the request of the trial judge that in the event of the grant of a new trial the cause be assigned to another trial judge. It is so ordered.

The question of taxing costs is no less complex than the questions in the case. We have examined

both GCR 1963, 526 and 822 and the annotations thereunder.

Plaintiff did not improve her position upon rehearing and cannot be considered a prevailing party.

Dearborn improved its position by reason of narrowing the scope of its exposure to liability, but only as to plaintiff. As to N & K and Whiting, whose interests were to a degree adverse to Dearborn, Dearborn did not prevail. Thus Dearborn cannot be said to have prevailed in full.

N & K and Whiting prevailed in full as to plaintiff and in full as to Dearborn to the extent their interests were adverse.

N & K and Whiting may each tax its costs apportioned as follows: one half the costs of each against plaintiff, one half the costs of each against Dearborn.

Dearborn prevailed in part as to plaintiff and may tax one half of its costs against plaintiff.

We deem the foregoing to be compliance with GCR 1963, 526.1.

All concurred.